[No. 31648-6-I. Division One. July 25, 1994.]

JANICE L. GOODMAN, *Respondent,* v. THE BOEING COMPANY, ET AL, *Appellants.*

*Russell L. Perisho* and *Perkins Coie,* for appellants.
*Abraham A. Arditi,* for respondent.

WEBSTER, C.J. — Boeing appeals a jury verdict and court orders in favor of Janice Goodman in a handicap discrimination action. Goodman cross-appeals the court's setoff and subrogation of her Industrial Insurance Act (IIA) benefits.

## FACTS

Goodman began working at Boeing microfilming airplane manuals in August 1984, a job requiring the repetitive use of the arms and hands. At the time, Goodman was also teaching classical ballet and high school gymnastics part time. Two and a half months later, Goodman was broadsided in a car accident injuring her head, neck, back and left arm. X-rays taken at the time of the accident established that Goodman had preexisting moderate osteoarthritis in her thumb joints. Goodman states she was not told of the arthritis at the time and did not know when she joined Boeing that she had it. Therefore, she did not include it in her employment information papers when she took the job with Boeing. When she began to experience pain in her right shoulder, elbow, wrist and thumb from filming, at the end of 1986, Goodman first requested that she be rotated from microfilming, and began to make efforts to transfer to other jobs at Boeing. In April 1987, while working, Goodman was injured; she was diagnosed as having tennis elbow in her right arm. Her then supervisor, Cherry Williams, wrote a report stating the injury was caused by constant arm and shoulder movement, and under corrective action taken, she wrote "n/a". Goodman filed a claim with the State Department of Labor and Industries for this injury, which was accepted, and covered all her subsequent medical and psychiatric expenses. Boeing, a self-insurer for purposes of workers' compensation, had paid $37,548.66 in time-loss compensation in connection with this temporary total disability by the time of trial.

In June 1987 Goodman saw her private doctor, Dr. Cancro, who determined that she had experienced a recurrence of tennis elbow and had also aggravated the osteoarthritis in her right thumb from "overuse". He prescribed a right hand

splint which Goodman wore at work. Goodman brought in notes from Cancro about her need to wear the splint and avoid overtime and overuse, and gave them to her supervisor, Amelia Anderson. Anderson admits she knew Goodman had doctor's notes but contests receiving them and contests knowing their substance, though a co-worker testified that she saw Goodman hand one to Anderson. Subsequently, Anderson continued to assign Goodman to work overtime and asked her to correct filming errors in addition to her own. Goodman and two co-workers testified that Anderson also often called Goodman "stupid" and criticized her style of dress and treated her condescendingly. Cancro also sent two notes to Axia, Boeing's workers' compensation claims processing firm (a division of Aetna), recommending Boeing modify Goodman's work. In late 1987, a new supervisor, Cherry Williams, did rotate Goodman, to a job coordinating microfilming wiring plans, and she did well there, but 2 weeks later when Williams was moved elsewhere and replaced by Jorene Zumdahl, a friend of Anderson's, Goodman was reassigned to filming. Zumdahl would stand behind Goodman and clap to ensure she kept her filming pace up. While Goodman was on the wiring job, Anderson told another worker to stop assisting her. About a month after Goodman was reassigned to filming, Cancro sent Axia a note saying the transfer had helped Goodman's condition and the reassignment was causing her elbow problem to recur. Six months later, Goodman's left arm swelled up and she went to Boeing medical, as advised by her supervisors. The Boeing doctor diagnosed tendinitis, prescribed Motrin and gave Goodman a left hand wrist/thumb splint which she also wore to work. Goodman did not tell this doctor about the ongoing nature of her problems. Williams again wrote the injury report, this time stating that Goodman had pulled a tendon through overuse; for corrective action, Williams wrote "none", but then noted that Goodman's recent transfer to the wiring position had eliminated the prolonged movement of her arms. Cancro sent Axia a note stating that since Goodman's reassignment to filming, her elbow had flared up

again, she was being overused as a photocopier and she should be rotated.

Goodman worked at Boeing 14 more months, and left on medical leave in January 1989, from which she did not return. In 1989, Goodman had a series of operations on both her hands: Dr. Almquist operated on her right elbow and thumb in January 1989, on her left thumb in August 1989, and on her left thumb again, due to complications, in March 1990. He permitted her to recommence work but cautioned her to avoid much hand movement. Dr. Blue operated on Goodman's left thumb in February 1992, and advised her she could return to work provided it involved minimal use of her hands.

At trial, Goodman claimed that Boeing work had aggravated her preexisting arthritic condition to a disabling point and that she should have been provided another job by Boeing that did not involve extensive use of her hands. Goodman claimed that she requested transfers she did not get. Boeing said she was not turned down because of her handicap but for reasons such as lack of qualification. Boeing said it offered Goodman receptionist jobs on three occasions and that she declined them. Goodman denies receiving these offers. In March 1992, a vocational rehabilitation counselor took information from Dr. Blue to Boeing about Goodman's physical capacities. Blue concluded Goodman was medically able to do four jobs offered by Boeing. In consultation with Blue, Boeing made the final necessary accommodations to a receptionist position and offered it to Goodman the day before trial. Goodman declined it saying the job was at a location far from her home, in the same department she worked in before, her hands would be very visible, and she was being set up to be fired. Blue and Fatta (a Boeing doctor) said they could not guarantee that Goodman would be able to perform the job even with the accommodations. Diane Newman, an occupational therapist, testified that Goodman could not do the job without hurting herself because it still involved repetitive hand movement. Kent Shaffer, a vocational rehabilitation counselor, testified that

Goodman's opportunities in the labor market were nil. Blue testified that any normal job could create a risk for Goodman. Goodman suffered severe depression and experienced panic attacks; she was treated psychiatrically and with antidepressants.

## PROCEDURAL FACTS

Goodman sued Boeing and Anderson in December 1990, asserting: (a) handicap discrimination under RCW 49.60, (b) negligent infliction of emotional distress, (c) intentional infliction of emotional distress, and (d) deliberate injury under RCW 51.24.020. The court granted Boeing's pretrial motion to strike a request for punitive damages under RCW 49.60.030(2). The case was tried to a jury.

After Goodman rested, the court dismissed her deliberate injury claim. It also dismissed that aspect of her RCW 49.60 claim based on Boeing's failure to transfer her because of the perceived effects of her hand injury. The jury returned a special verdict (a) against Boeing on the RCW 49.60 reasonable accommodation claim, (b) against Boeing and Anderson on the negligent infliction claim, and (c) against Goodman on the intentional infliction claim. The jury awarded Goodman (a) $97,159.80 for lost past earnings and earnings capacity, (b) $288,356.46 for lost future earnings and earnings capacity, (c) $200,000 for pain, suffering, emotional distress and loss of enjoyment, (d) $25,000 for disfigurement, and (e) $553,091 for future medical expenses, household help and other nonmedical expenses.

After verdict, the court offset $37,548.66 — the amount of IIA time-loss benefits Goodman received up to trial — against the award for lost past earnings and earnings capacity. The court subrogated Boeing to Goodman's future workers' compensation benefits. The court awarded Goodman $266,801.34 in attorneys' fees and costs.

Boeing timely filed its notice of appeal, stating that due to serious, prejudicial errors in evidentiary rulings and jury instructions, a new trial should be ordered on Goodman's handicap discrimination and negligent infliction of emo-

tional distress claims. Goodman cross-appealed, asking the court to affirm the judgment, except for the $37,548.66 offset and subrogation of Boeing to Goodman's future workers' compensation benefits. Goodman also requests reasonable attorneys' fees. She adds that if this court reverses any part of the judgment on appeal, it should also reverse dismissal of her claims for punitive damages, deliberate injury, and disparate treatment.

I

The central issue in this case is whether the exclusive remedy provisions of the IIA bar Goodman's RCW 49.60 claim for damages for workplace injuries. Boeing claims the court's instructions improperly allowed the jury to award Goodman damages resulting from her industrial injury, arguing that the IIA bars such damages, and that Boeing was prejudiced by the court's refusal to apply the bar to Goodman's RCW 49.60 claim.[1]

When reviewing a challenge to jury instructions, our inquiry is whether the trial court abused its discretion by giving or refusing to give certain instructions. *See Connor v. Skagit Corp.*, 30 Wn. App. 725, 731, 638 P.2d 115 (1981), *aff'd*, 99 Wn.2d 709, 664 P.2d 1208 (1983). Jury instructions are not erroneous if they (1) permit each party to argue the theory of the case, (2) are not misleading, and (3) when read as a whole, properly inform the trier of fact of the applicable law. *Judd v. Department of Labor & Indus.*, 63 Wn. App. 471, 820 P.2d 62 (1991). Even if an instruction is misleading, and therefore erroneous, it will not require reversal unless prejudice is shown. *Thomas v. French*, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983). Error is not prejudicial unless it affects or presumptively affects the outcome of the trial. *Thomas*, at 104.

Here, the court refused to instruct the jury as Boeing proposed, namely, that Goodman could not be awarded dam-

---

[1]We find that Boeing has not waived its right to review this issue. In formal exceptions to jury instructions, Boeing asserted its position on the IIA bar several times. Its own proposed jury instructions stated the same. The court found in a posttrial hearing that Boeing had raised the issue sufficiently.

ages for her physical injury or disfigurement, and instead gave the jury instruction 19, a general damages instruction.[2]

The IIA's exclusivity provision provides that when a worker is injured in the workplace,

> all phases of the premises are withdrawn from private controversy, and sure and certain relief . . . is hereby provided regardless of questions of fault and to the exclusion of every other remedy, proceeding or compensation, except as otherwise provided in this title . . ..

RCW 51.04.010. Similarly, RCW 51.32.010 provides:

> Each worker injured in the course of his or her employment . . . shall receive compensation in accordance with this chapter, and, except as in this title otherwise provided, such payment shall be in lieu of any and all rights of action whatsoever against any person whomsoever . . ..

---

[2]"It is the duty of the court to instruct you as to the measure of damages. By instructing you on damages the court does not mean to suggest for which party your verdict should be rendered.

"If your verdict is for the plaintiff, you must determine the amount of money which will reasonably and fairly compensate her for such damages as you find were caused by the acts of the defendants.

"You should consider the following elements:

"(a) The nature and extent of the injury.

"(b) The disability, disfigurement and loss of enjoyment of life experienced in the past and present and with reasonable probability to be experienced in the future.

"(c) The pain, suffering and emotional distress, both mental and physical, experienced in the past and present and with reasonable probability to be experienced in the future.

"(d) The reasonable value of necessary medical care, treatment and services to be required with reasonable probability in the future.

"(e) The reasonable value of necessary household help and other non-medical services with reasonable probability to be required in the future.

"(f) The reasonable value or earnings or earning capacity lost in the past and present and the present value of earnings or earnings capacity with reasonable probability to be lost in the future. 'Earnings' or 'earnings capacity' includes but is not limited to health insurance, dental insurance, savings plans, pensions and bonuses.

"The burden of proving damages rests with the plaintiff and it is for you to determine, based upon the evidence, whether any particular element has been proved by a preponderance of the evidence.

"In determining an award for pain, suffering, disfigurement, disability or emotional distress, the law requires a reasonable basis for your computations. With reference to these matters you must be governed by your own judgment, by the evidence in the case and these instructions."

However, RCW 49.60.010 states that it is "an exercise of the police power of the state for the protection of the public welfare, health, and peace of the people of this state", and section .020 emphasizes that "[t]he provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof."

■ We base our decision that RCW 49.60 claims are not precluded by the IIA on *Reese v. Sears, Roebuck & Co.*, 107 Wn.2d 563, 731 P.2d 497 (1987). Reese had been employed by Sears as a warehouseman since 1968. *Reese*, 107 Wn.2d at 565. In 1980, he began receiving treatment for foot pain and could no longer do the work assigned to him. *Reese*, at 565. His physician advised Sears that he receive light duty work. *Reese*, at 565. Sears refused to allow Reese to return to work until he could " 'work full capacity' ". *Reese*, at 566. Reese filed a workers' compensation claim based on his foot injury, which was approved. *Reese*, at 566. Reese sought to continue working doing light work. *Reese*, at 566. Sears refused to accommodate Reese's "new handicap", and refused to continue Reese's employment absent a full medical release from Reese's physician, which Reese's doctor could not give. *Reese*, at 566. As a result, Reese sued Sears for handicap discrimination under RCW 46.90 alleging that Sears had failed to accommodate his disability. *Reese*, at 566. The *Reese* court held that the IIA bar does not apply where the injuries are distinct, stating that where the injuries (1) are of a different nature, (2) arise at different times in the employee's work history, and (3) require different causal factors (an IIA claim is indifferent to employer fault; a discrimination claim requires fault), the two injuries cannot be " 'the same injury' ". *Reese*, at 574. The court held that Reese had suffered two distinct injuries: a physical injury suffered in the workplace and actionable under the IIA, and a subsequent injury allegedly caused by the employer's handicap discrimination, actionable under RCW 49.60. *Reese*, at 568. Thus, the court held Reese's IIA claim for a physical injury suffered on the job should not bar his action to recover for the additional harm suffered from management's subse-

quent and allegedly discriminatory response to his resulting disability. *Reese*, at 573. The court also addressed the double recovery issue, finding no such problem because there were two distinct wrongs. *Reese*, at 574. Reese's potential damage recoveries under RCW 49.60 dated from when his discrimination claim matured which occurred when his employer refused to allow him to report back to work and allegedly to accommodate his handicap. The court noted that on remand posttrial IIA benefits could be deducted from his discrimination damages wherever necessary to prevent double recovery. *Reese*, at 574.

Here, similarly, Goodman suffered a physical injury, right arm tennis elbow, for which she was compensated under the IIA. Subsequently, she continued working, and tried to be transferred out of her position as a microfilmer, but had little, temporary success. She presented the jury evidence that her condition visibly deteriorated but her Boeing supervisors failed to accommodate her handicap. Like Reese, Goodman then sued her employer for handicap discrimination, the handicap claimed having resulted from an injury covered by industrial insurance. Under the *Reese* test, Goodman's injuries were distinct: the IIA injury Goodman suffered and was compensated for in early 1987 was right arm tennis elbow; the discrimination led to aggravation of her condition into her left arm between 1987 and 1989, and formed the basis of her RCW 49.60 claim. Like Reese, Goodman's IIA claim for a physical injury suffered on the job does not bar her action to recover for the additional harm suffered from Boeing's subsequent discriminatory response to her resulting disability.[3] Further, the trial court averted

---

[3]*See also Hinman v. Yakima Sch. Dist. 7*, 69 Wn. App. 445, 850 P.2d 536 (1993) (damages are recoverable for an RCW 49.60 claim when the employer refuses to reasonably accommodate the handicap, citing *Reese* for the proposition that there are no double recovery problems with simultaneous IIA and Law Against Discrimination (LAD) actions because there are two distinct wrongs involved. Damages are recoverable for a LAD claim when the employer refuses to accommodate an employee's handicap; at this point, the IIA bar is lifted); *Atlantic Mut. Ins. Co. v. Roffe, Inc.*, 73 Wn. App. 858, 872 P.2d 536 (1994) (suggesting that where physical injuries are caused by discriminatory conduct, damages for such injuries are recoverable).

any double recovery problem by subrogating Boeing to Goodman's posttrial workers' compensation benefits.

Based on *Reese*, we find that the IIA does not bar Goodman's RCW 49.60 claim.

## II

Boeing claims jury instruction 19 improperly allowed Goodman to avoid the IIA bar by permitting her to recover damages on her common law claim for emotional distress based on her industrial injury.[4] Boeing argues that because the general damages instruction, instruction 19, was so broad, the more specific damages instruction, instruction 22, which limited Goodman's recovery on her common law emotional distress claim to verbal conduct only, was overshadowed.

■ ■ Boeing correctly asserts that in instruction 19 the court instructed the jury to consider awarding Goodman damages based on Goodman's *mental and physical emotional distress*:

> pain, suffering and emotional distress, *both mental and physical*, experienced in the past and present and with reasonable probability to be experienced in the future.

(Italics ours.) Additionally, the court instructed the jury to consider Goodman's disfigurement. However, in the more specific, emotional distress instruction, the court instructed the jury that it could only award Goodman common law emotional distress damages based on the Defendant's *verbal conduct*:

> You may award damages for emotional distress proximately caused by the fact that Ms. Goodman was discriminated against only if you find for Ms. Goodman on her discrimination claim.
>
> You may award emotional distress damages proximately caused by defendant's *verbal conduct* toward Ms. Goodman only if you find for Ms. Goodman on her negligent infliction of emotional distress claim.
>
> You may award emotional distress damages proximately caused by defendants' verbal or non-verbal conduct on her outrage claim if you find for Ms. Goodman on this claim.

---

[4]Goodman received workers' compensation benefits for her industrial injury-related psychic damage up to trial.

(Italics ours.) Instruction 22. This instruction only allowed damages for negligent infliction due to verbal conduct. Thus, the damages are for Anderson's (and possibly Zumdahl's) harassment of Goodman at work and not for Goodman's physical injuries. Harassment would not have been compensable under the IIA either as an injury or as an occupational disease, and therefore falls outside basic coverage of the act. The claim was thus unaffected by the IIA's exclusive remedy provision. *Wheeler v. Catholic Archdiocese*, 65 Wn. App. 552, 568, 829 P.2d 196, *review granted*, 120 Wn.2d 1011 (1992). Furthermore, Goodman did not argue that she was entitled to recover damages for negligent infliction of emotional distress flowing from her physical injury. Her entire argument on the negligent infliction claim is comprised in 12 lines of transcript, none of which refers to her physical injury. The trial court is given considerable discretion in deciding how the instructions will be worded. *Gammon v. Clark Equip. Co.*, 104 Wn.2d 613, 617, 707 P.2d 685 (1985). Furthermore, jury instructions must be read as a whole. *Gammon*, at 617. Reading instructions 19 and 22 together, we find that instruction 19 was not misleading, and conclude that the court did not err in instructing the jury as it did.

### III

Boeing claims that the court's instructions improperly allocated the employer's and employee's duties in accommodating handicaps. The court instructed the jury in part that:

> To recover on her claim for handicap discrimination Ms. Goodman has the burden of proving each of the following propositions:
>
> . . . .
>
> (2) Boeing knew or should have known of [her] handicap
> . . ..

Instruction 13.

Boeing argues that Washington cases imply the duty to accommodate does not arise until the employer knows of the employee's handicap and that the employee needs accommodation, citing *Phillips v. Seattle*, 111 Wn.2d 903, 911, 766 P.2d 1099 (1989); *Reese*, 107 Wn.2d at 565; *Dean v.*

*Municipality of Metro. Seattle,* 104 Wn.2d 627, 708 P.2d 393 (1985). No Washington case squarely addresses whether, in a reasonable accommodation case, the employee's burden is satisfied by a showing that his or her employer "should have known" of his or her handicap.[5] In any event, we find that Boeing waived its right to object by proposing the following jury instruction:

> To prove that Boeing failed in its duty to reasonably accommodate her, Ms. Goodman must prove the following four things:
>
> . . . .
>
> 2. that Boeing knew or had reason to know of this handicap . . ..

Defendant's proposed instruction 15.[6] Based on a plain reading, we find the language of the proposed instruction to substantially mirror the language in the court's corresponding instruction. Boeing cannot allege error where it proposed an instruction containing the very same error. *State v. Neher,* 112 Wn.2d 347, 352-53, 771 P.2d 330 (1989).

Boeing also asserts that the instructions should have stated that the duty to accommodate arises only when an employee cannot perform his or her job, citing *Jane Doe v. Boeing Co.,* 121 Wn.2d 8, 18-21, 846 P.2d 531 (1993). Doe, a Boeing worker, was undergoing sex reassignment surgery, and sought damages for employment discrimination alleging an unaccommodated handicap. *Jane Doe,* at 10. The court denied Doe relief stating that her condition was not a handicap within RCW 49.60 because it did not affect her ability to

---

[5]While the physical handicap cases seem to track federal law in requiring the employer to make reasonable accommodation to the *known* limitations of an otherwise qualified handicapped employee, *see, e.g., Dean,* 104 Wn.2d at 635; 42 U.S.C.S. § 12112(b)(5)(A) (Law. Coop. Supp. 1994), Washington race and sex discrimination cases hold that to establish work environment harassment, an employee must prove, *inter alia,* that the employer "knew or should have known" of the harassment and failed to take reasonably prompt and corrective action. *See, e.g., Glasgow v. Georgia-Pacific Corp.,* 103 Wn.2d 401, 406, 693 P.2d 708 (1985); *Fisher v. Tacoma Sch. Dist. 10,* 53 Wn. App. 591, 595, 769 P.2d 318, *review denied,* 112 Wn.2d 1027 (1989).

[6]In its motion for new trial, Boeing did not cite proposed instruction 15, but rather pointed to its proposed instruction 16 which stated that Boeing only had to accommodate Goodman if it "knew that she had a handicap *and* if Boeing knew that this handicap required accommodation".

perform her job. *Jane Doe*, at 20. These facts are distinguishable from those of the case at bar. Evidence presented made it clear that Goodman's performance was seriously affecting her health. She wore braces on both arms at one point (which Anderson conceded seeing) and, moreover, Anderson was well acquainted with Goodman's medical problems, having suffered similar problems herself. It would be inequitable to read *Jane Doe* to preclude Goodman relief. Here, it was not seriously disputed that Goodman could not do her job. Thus, we find that the court did not err in instructing the jury on reasonable accommodation.

## IV

Boeing claims that RCW 49.60 and case law establish that discriminatory intent is required in order to prevail on a claim of discrimination. Boeing has not preserved this error. While Boeing did include one sentence to this effect in its trial brief, it failed to propose a jury instruction on reasonable accommodation which included an intent requirement. If a party is dissatisfied with an instruction, it is that party's duty to propose an appropriate instruction and, if the court fails to give the instruction, take exception to that failure. *Hoglund v. Raymark Indus., Inc.*, 50 Wn. App. 360, 368, 749 P.2d 164 (1987), *review denied*, 110 Wn.2d 1008 (1988). If a party does not propose an appropriate instruction, it cannot complain about the court's failure to give it. *Hoglund*, at 368. Because Boeing failed to offer a reasonable accommodation instruction which included an intent requirement, we will not consider whether the trial court erred in not giving such an instruction.[7]

---

[7]In any event, while no court had addressed the express issue of whether or not reasonable accommodation actions require intent, it appears that discrimination claims may be brought under various theories, of which only one requires intent. The theories are disparate treatment, disparate impact, reasonable accommodation or surmountable barrier, and insurmountable barrier theories, with only disparate treatment claims requiring proof of discriminatory intent. *See Shannon v. Pay 'N Save Corp.*, 104 Wn.2d 722, 726-28, 709 P.2d 799 (1985); *Oliver v. Pacific Northwest Bell Tel. Co.*, 106 Wn.2d 675, 678-79, 724 P.2d 1003 (1986); *Prewitt v. United States Postal Serv.*, 662 F.2d 292, 305 n.19 (5th Cir. 1981). *See also Dean* (handicapped employee was not required to show that employer engaged in intentional discrimination to recover emotional distress damages).

## V

Boeing claims the court should have defined "continuing violation", and should have explained that a continuing violation will not extend back the period for which damages may be recovered. Boeing argues that the court's errors prejudiced it because it is substantially likely the jury found a continuing violation and awarded Goodman damages sustained prior to the limitations period.

■ Whether to define a phrase is a matter of judgment to be exercised by the trial court. *Seattle v. Richard Bockman Land Corp.*, 8 Wn. App. 214, 217, 505 P.2d 168, *review denied*, 82 Wn.2d 1003 (1973). Ninth Circuit case law defines "continuing violation" as a "series of related acts against a single individual". *Green v. Los Angeles Cy. Sup't of Schs.*, 883 F.2d 1472, 1480 (9th Cir. 1989). The court stated that the question boils down to whether sufficient evidence supports a determination that the alleged discriminatory acts are related closely enough to constitute a continuing violation. *Green*, at 1480. We think that this definition is fairly self-evident and the two Washington cases that discuss the continuing violation theory do not define the term. *Henderson v. Pennwalt Corp.*, 41 Wn. App. 547, 704 P.2d 1256 (1985); *Lewis v. Lockheed Shipbuilding & Constr. Co.*, 36 Wn. App. 607, 676 P.2d 545 (1984). Applied to this case, the definition is obvious. The series of related acts would be Boeing and Anderson's continued assignment of Goodman to exacting filming positions, Goodman being the single individual not regularly rotated.

■ ■ Neither *Henderson* nor *Lockheed* is precisely on point. *Henderson*, at 555-56, held that a party asserting the statute of limitation as a bar to a portion of a claim for damages has the burden of proving specifically which portion of the damage occurred outside the limitation period concerned,[8] while *Lockheed* held that an alleged discrimina-

---

[8] *Henderson* makes clear that "[e]vidence of discriminatory treatment occurring before the limitations period is admissible to show a pattern of illegal conduct, purpose, or motivation with regard either to independent violations that occur after the limitation period or to continuing violations that began before and continue after the limitations period." *Henderson*, at 553. Thus, Goodman's pre-1987 evidence was properly admitted.

tory refusal to rehire, standing alone, will not give rise to
a continuing violation absent an allegation of ongoing pat-
tern of discrimination. RCW 49.60 substantially parallels
federal law and thus, in construing the Washington stat-
ute, Washington courts may look to interpretations of the
federal law. *Hollingsworth v. Washington Mut. Sav. Bank*,
37 Wn. App. 386, 681 P.2d 845, *review denied*, 103 Wn.2d
1007 (1984). Ninth Circuit case law in the context of age
discrimination in employment suggests that such damages
are recoverable. *See EEOC v. Local 350, Plumbers*, 982 F.2d
1305, 1308 (9th Cir. 1992), *superseded by* 998 F.2d 641
(1993):

> "Under the continuing violation doctrine, 'a systematic policy
> of discrimination is actionable even if some or all of the events
> evidencing its inception occurred prior to the limitations peri-
> od.' " The doctrine is applied because " 'the continuing system of
> discrimination operates against the employee and violates his
> or her rights up to a point in time that falls within the
> applicable limitations period.' " When the doctrine is applicable,
> "no part of a continuing violation *which persists into the period
> within which suit is allowed* is time-barred."

(Citations omitted.) *EEOC*, at 644 (quoting *Malhotra v. Cot-
ter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989); *Sosa v.
Hiraoka*, 920 F.2d 1451, 1455 (9th Cir. 1990) (conduct alleged
by professor occurring prior to 180-day period was action-
able because it was part of a continuing violation of his Title
VII, 42 U.S.C.A. § 2000a rights up to a point in time falling
within the limitations period)).

An action alleging a violation of personal rights estab-
lished by RCW 49.60 must be brought within the 3-year
limitation period established by RCW 4.16.080(2). *Lockheed*,
at 613.[9] Here, the court's instruction permitted the jury to

---

[9]It should be noted that Boeing did not raise this issue until jury instructions.
At that time, however, Boeing proposed a jury instruction that denied pre-
limitations-period damages. Curiously, during exceptions, Boeing did not object to
the use of the court's language "unless you find continuing violations". In fact, it
was Boeing that proposed that the last sentence read "unless you find continuing
violations extending into the period after December 7, 1987". Boeing's instruc-
tion 24 read as follows: "You have heard evidence concerning events which
occurred prior to December 7, 1987. Testimony concerning those events is offered
solely by way of background. You may not find Boeing or the Andersons liable for
any eventsthat occurred before December 7, 1987. You may not award damages

award pre-limitations-period damages *if the jury found that a continuing violation was established by the evidence.*[10] Further, while the court did fail to instruct the jury that Goodman had the burden of proving a continuing violation, Goodman carried this burden anyway.[11] Goodman's evidence from 1986 onward, relating to that part of her RCW 49.60 claim concerning her shoulder, elbow, arm and wrist problems, is the relevant evidence here. Because Goodman sued Boeing in 1990, the only part of her damages that could have been barred by the 3-year statute of limitations was the 1986 evidence. However, we find that Goodman sufficiently alleged facts constituting a series of acts against her manifesting handicap discrimination; and guided by Ninth Circuit precedent, we hold that the court's instruction was not erroneous.

## VI

■ Boeing claims the court erred in failing to determine whether reinstatement was practicable before allowing the jury to award Goodman front pay. It is within the trial court's discretion to award damages for loss of future earnings, known as front pay, representing the difference between what the employee would have earned from his or her former employer and the amount, if any, he or she could expect to earn from his or her new employer. *Hayes v. Trulock*, 51 Wn. App. 795, 802, 755 P.2d 830, *review denied*, 111 Wn.2d 1015 (1988). "[O]nce the trial court determines that the award of front pay is appropriate under the facts of a

for any events occurring before December 7, 1987 or for any injuries suffered before December 7, 1987."

[10]Instruction 6 provided: "You have heard evidence concerning events which occurred prior to December 7, 1987. . . . You may not find Boeing or the Andersons liable for any events that occurred before December 7, 1987, unless you find continuing violations extending into the period after December 7, 1987."

[11]While Goodman's evidence dated from about mid-1985, her 1985-related evidence concerned that part of her RCW 49.60 claim based on Boeing's failure to transfer her because of the perceived effects of her head injury. The court dismissed this claim after Goodman rested. In any case, this evidence is not relevant to that aspect of her claim at issue here.

given case, the amount of front pay should be determined by a jury. These are often cases where reinstatement is not an available remedy." *Pannell v. Food Servs. of Am.*, 61 Wn. App. 418, 442, 810 P.2d 952, 815 P.2d 812 (1991), *review denied*, 118 Wn.2d 1008 (1992). A court does not err in failing to instruct the jury that reinstatement is impracticable, because the decision to order the equitable remedy of reinstatement or, alternatively, front pay, is a decision for the trial court. *See Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1347 (9th Cir. 1987), *cert. denied*, 484 U.S. 1047 (1988). However, front pay awards, like back pay awards, must be reduced by the amount a plaintiff could earn using reasonable mitigation efforts to seek alternative employment. *Cassino*, at 1346. The burden of proving lack of diligence in mitigating damages is on the defendant. *Smith v. American Serv. Co. of Atlanta, Inc.*, 796 F.2d 1430, 1431 (11th Cir. 1986).

■■■ None of the cases Boeing cites holds that the court has a duty to make a formal finding that reinstatement is impracticable before it submits the front pay issue to the jury. *Pannell* only indicates that cases in which the trial court determines front pay is appropriate and then submits the issue to the jury are often — not always — cases where reinstatement is inappropriate. It does not address whether this decision need be made on the record. The relevant cases only state that a plaintiff may receive either one remedy or the other. Although the court instructed the jury on mitigation and Boeing cited *Cassino* in its brief, Boeing did not argue that Goodman was not entitled to a front pay award because she failed to mitigate by accepting its job offer. Instruction 24.

We find that the court did not abuse its discretion in submitting the issue of front pay to the jury without a stated determination that reinstatement was impracticable.

## VII

Boeing claims the court erred in allowing into evidence a Social Security decision finding Goodman totally disabled,

arguing that the decision was based on one-sided evidence, confusing and prejudicing the jury.

A trial court's admission or refusal of evidence lies within the discretion of the trial court and will not be disturbed on appeal absent a showing of abuse of discretion. *Norris v. State*, 46 Wn. App. 822, 826, 733 P.2d 231 (1987). RCW 5.44.040 provides:

> Copies of all records and documents on record or on file in the offices of the various departments of the United States . . . shall be admitted in evidence in the courts of this state.

Washington's Supreme Court stated that in order to be admissible under RCW 5.44.040, a public document

> must contain facts and not conclusions involving the exercise of judgment or discretion or the expression of opinion. The subject matter must relate to facts which are of a public nature, it must be retained for the benefit of the public and there must be express statutory authority to compile the report.

*State v. Monson*, 113 Wn.2d 833, 839, 784 P.2d 485 (1989) (quoting *Steel v. Johnson*, 9 Wn.2d 347, 358, 115 P.2d 145 (1941)).

Boeing cites *Monson* for the proposition that public records are admissible only if they contain facts, not discretionary conclusions, and asserts that the Social Security decision at issue does not satisfy *Monson*'s "facts and not conclusions" requirement. Although there is no Washington law addressing the admissibility of Social Security decisions, Ninth Circuit case law holds administrative decisions admissible even if they contain conclusions so long as the conclusions are factually based and trustworthy under Federal Rule of Evidence (FRE) 803. *Baldwin v. Rice*, 144 F.R.D. 102, 104 n.3 (E.D. Cal. 1992) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 102 L. Ed. 2d 445, 109 S. Ct. 439 (1988)).

Here, the court stated that *Monson* was unclear as to the persuasiveness of federal cases. Exercising its discretion, the court carefully reviewed the administrative law judge's decision and determined that it was trustworthy under FRE

803, suggested redaction of certain statements, and permitted Boeing to redact still others. We find no error here.[12]

## VIII

Boeing claims that there was no competent testimony to support the jury's $421,568 award for Goodman's need for a personal companion when she reached the age of 67.5. Boeing argues that Nurse Kerrick was not competent to determine whether or not Goodman's medical condition would deteriorate in 12 years. This, Boeing asserts, requires a medical diagnosis and no such diagnosis/prognosis was presented by a qualified witness.

■ Trial courts retain broad discretion in determining whether an expert is qualified to testify on health-related matters and will be reversed only for manifest abuse. *See Harris v. Groth*, 99 Wn.2d 438, 663 P.2d 113 (1983). Whether or not an expert is licensed to practice medicine is a factor, but not dispositive, in making this determination. *Harris; Judd v. Department of Labor & Indus.*, 63 Wn. App. 471, 475, 820 P.2d 62 (1991). Per se limitations on the testimony of otherwise qualified nonphysicians are not in accord with the general trend in the law of evidence, which is away from reliance on formal titles or degrees. *Harris*, 99 Wn.2d at 449; *Judd*, 63 Wn. App. at 475; 5A Karl B. Tegland, Wash. Prac., *Evidence* § 289, at 382-83 (3d ed. 1989). A witness need not possess the academic credentials of an expert. Training in a related field or academic background alone may also be sufficient. ER 702; *Judd*, 63 Wn. App. at 475.

■ Boeing cites cases from foreign jurisdictions stating that nurses may offer expert testimony only as to their narrow area of expertise. Kerrick did only offer testimony as to her area of expertise. For, though Kerrick relied on medical

---

[12]We note that the facts the document relied on are already part of the trial record. Pages 1-3 of the Social Security decision contained Goodman's medical records and a description of her functional limitations and depression, all of which is in the record. Page 4 set forth a vocational expert's opinion on the absence of jobs Goodman could do in the regional or national economy. At trial, vocational counselor Kent Shaffer testified to the same effect.

diagnoses, she made only the nursing diagnoses herself.[13] Nursing diagnoses include "[t]he observation, assessment, diagnosis, care or counsel . . . of the ill, injured or infirm". Former RCW 18.88.030(1). Regulations require registered nurses to make judgments as to the future needs of patients. WAC 246-839-700(1)(b). Kerrick's training and experience qualify her as an expert on care needs, present and future. She is a registered nurse with 35 years' experience, has a master's degree in nursing, and specializes in rehabilitation, hospice and home-care nursing. She makes care referrals without a physician's supervision and creates long-term nursing plans. Thus, Kerrick was a competent witness.

 ██ Boeing also argues that there was insufficient evidence to support this award. Boeing asserts that Kerrick's testimony rested on her stated assumption that the aging process would augment Goodman's need for home care.[14] Boeing stresses that no doctor testified to the proximate cause of Goodman's need for future home care. For the same reasons we found Kerrick's testimony competent to support the award, we find it sufficient to support the award. The test for sufficiency of the evidence is whether there was evidence or reasonable inferences therefrom to sustain the verdict when the evidence is considered in the light most favorable to the prevailing party. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 261, 840 P.2d 860 (1992). Kerrick's testimony provided a detailed analysis of Goodman's situation. An appellate court may not substitute its evaluation of the evidence for that made by the trier of fact. *Washburn*, at 262. Furthermore, the jury was instructed to

---

[13]Even if Kerrick's diagnosis was "medical" in nature, training in a related field may have qualified her to make it. *See Judd*, at 475.

[14]In any case, Boeing's argument would fail. Kerrick stated that the aging process would deteriorate Goodman's *already impaired functions*, which the jury could have attributed to Goodman's work at Boeing, rather than on speculation:

Muscle atrophy is a part of the normal aging process. It has more relevance to Ms. Goodman because she already has impaired functions. She already has muscle atrophy and loss. With continued atrophy of aging, it would be in addition to what she already has.

award damages only "for such damages as you find were caused by the acts of the defendants". Appellate courts will not disturb a jury's damage verdict if it is within the range of the evidence. *Washburn,* at 268. Here, where Goodman's hands are disfigured and incapable of much movement, the jury was entitled to infer that in the future she will require a caretaker, and that her condition might have been different had Boeing accommodated her disability. We find that the court did not abuse its discretion in determining Kerrick's testimony competent and sufficient to support the award for Goodman's future home care.

## IX

Boeing claims that the court should have excluded Goodman's offer of classic "ambush" forensic testimony by occupational therapist Diane Newman, which surprised and unfairly prejudiced Boeing. A court may not exclude testimony as a sanction for failure to disclose "absent any showing of intentional nondisclosure, willful violation of a court order, or other unconscionable conduct." *Fred Hutchinson Cancer Research Ctr. v. Holman,* 107 Wn.2d 693, 706, 732 P.2d 974 (1987) (quoting *Smith v. Sturm, Ruger & Co.,* 39 Wn. App. 740, 750, 695 P.2d 600, *review denied,* 103 Wn.2d 1041 (1985)).

Newman testified that Goodman would have difficulties doing the jobs offered her by Boeing. Her testimony was based largely on a forensic examination of Goodman's hands performed the night before her trial testimony. Boeing objected that it was prejudiced by not being able to cross-examine Newman effectively. While discovery cutoff was May 29, 1992, the only job Boeing offered Goodman before then was eliminated after 2 weeks. Boeing did not identify other jobs for Goodman until June 22, and did not offer her any until June 30. However, the accommodations remained to be worked out, and these were not finalized until July 17. Goodman had identified Newman as an expert on issues in the case in February 1992. Boeing deposed Newman on June 30. Goodman felt her condition had deteriorated since

her last exam in March 1992 (performed at the Seattle Hand Rehabilitation Clinic by an Elizabeth Spencer) at which time the modifications had not been worked out, so she felt she should consult Newman as to whether she could do the job as modified.[15]

Boeing did not allege willful nondisclosure at trial. Rather, Boeing conceded that Goodman and Newman had worked cooperatively with it in the case. Therefore, it seems odd for Boeing to now label the defense's conduct willful. While Boeing now says a deposition would have been insufficient to counter the prejudice, at trial it said:

> Your Honor, Ms. Newman and Mr. Arditi were quite cooperative, and we had an interview during the break. As a result I don't believe there will be a need to take her deposition tonight.

Boeing also reserved the right to seek an additional independent medical examination of Goodman but never followed through. Newman stayed overnight, and thus Boeing had sufficient time to consult her and to prepare cross examination.

Even if the disclosure here could be deemed "willful", the trial court has vast discretion in deciding whether and how to sanction such a violation. *Allied Fin. Servs., Inc. v. Mangum*, 72 Wn. App. 164, 168 n.4, 864 P.2d 1, 871 P.2d 1075 (1993) (citing *Lampard v. Roth*, 38 Wn. App. 198, 202, 684 P.2d 1353 (1984)). Where, as here, no prejudice is demonstrated, the trial court is not obligated to impose the sanction of exclusion. *Allied*, at 168 n.4 (citing *In re Estate of Foster*, 55 Wn. App. 545, 548-49, 779 P.2d 272 (1989), *review denied*, 114 Wn.2d 1004 (1990)). The court permitted Boeing to review Newman's notes with her, and offered Boeing the chance to depose Newman to mitigate any effect of surprise; Boeing declined these offers. Boeing was not prejudiced, and the court did not err in permitting Newman's testimony.

---

[15]Newman previously worked at the Seattle Hand Rehabilitation Clinic and was Goodman's physical therapist there until 1992 when she moved to Montana.

## X

■ Boeing claims the court's definition of "handicap" was confusing and misleading, and objected to it at trial. The court defined "handicap" as follows:

> A condition is a "sensory, mental or physical handicap" if it is an abnormality, and is a reason why the person having the condition did not get or keep the job in question.

Instruction 14. This definition was drawn from WAC 162-22--040 and was adopted by the Supreme Court in *Phillips v. Seattle*, 111 Wn.2d 903, 906-08, 766 P.2d 1099 (1989), recently reaffirmed in *Jane Doe v. Boeing Co.*, 121 Wn.2d 8, 15, 846 P.2d 531 (1993). The *Jane Doe* court admitted the definition was circular, requiring a factual finding of discrimination because of the condition in order to determine whether the condition is a handicap in the first instance. *Jane Doe*, at 16. However, the court affirmed the definition, stating it was fundamentally sound, requiring (1) the presence of an abnormal condition and (2) employer discrimination because of that condition. *Jane Doe*, at 16. Thus, we find no error here.

## XI

Boeing contends that information cannot be imputed from agent to principal unless the agent is required to relay such information to the principal, and the court's error in instructing to the contrary in instruction 20 prejudiced Boeing. Boeing claims that its workers' compensation claims processing firm, Axia, received medical information about Goodman which Axia was not required to, nor did it, convey to Boeing.

■ As a general rule, knowledge of the agent will be imputed to the principal only where it is relevant to the agency and the matters entrusted to the agent. Restatement (Second) of Agency § 268 cmt. c (1958). The principal is bound by a notification directed toward an agent who "has, or appears to have, authority in connection with it, either to receive it, to take action upon it, or to inform the principal or some other agent who has duties in regard to it". *Roderick*

*Timber Co. v. Willapa Harbor Cedar Prods., Inc.*, 29 Wn. App. 311, 317, 627 P.2d 1352 (quoting Restatement (Second) of Agency § 268 cmt. c (1958)), *review denied*, 96 Wn.2d 1003 (1981). Here, the Axia supervisor on Goodman's claim stated:

> My responsibility would be to get the necessary documentation from the attending physician. . . . And then that information would be conveyed to Boeing Medical and/or Boeing Medical would write up the medical restrictions or medical recommendations. And that information would then be conveyed to the personnel department of that particular Boeing employee's division or section, and they would take whatever action they felt was appropriate.

Based on the above, it appears to be within the scope of Axia's authority to receive and act on the information it received regarding Goodman over the course of 2 years through her claims for reimbursement and Dr. Cancro's letters to Axia regarding Goodman's condition.

The cases Boeing cites state that such a requirement is a sufficient condition, not a necessary one. *See, e.g., Peck v. Siau*, 65 Wn. App. 285, 290, 827 P.2d 1108 (knowledge may be imputed if it relates to the subject matter of the agency, and the agent acquired it while acting within the scope of his or her authority), *review denied*, 120 Wn.2d 1005 (1992). Based on the Restatement and case law, we find that the court did not misstate the law in instruction 20.

## XII

Goodman cross-appeals claiming the court erred in offsetting the amounts received and in subrogating her to any future IIA benefits she may receive. She claims that the trial court erred in refusing to give the IIA benefits protection of the collateral source rule. Boeing responds that as a self-insurer it should not be subject to the collateral source rule.

The collateral source rule states that

> [b]enefits received by a plaintiff from a source collateral to the tortfeasor or contract breacher may not be used to reduce a defendant's liability for damages. This collateral source rule holds true even if the benefits are payable to the plaintiff because of the defendant's actionable conduct.

*Hayes v. Trulock,* 51 Wn. App. 795, 803, 755 P.2d 830, *review denied,* 111 Wn.2d 1015 (1988). No Washington case has resolved the question whether workers' compensation benefits fall within the collateral source rule in a suit against one's employer. In *Reese v. Sears, Roebuck & Co.,* 107 Wn.2d 563, 731 P.2d 497 (1987) the court stated in dictum that the amount of workers' compensation benefits received by a party prevailing on its employment discrimination claim can be deducted from damages wherever necessary to prevent double recovery. *Reese,* 107 Wn.2d at 574. In *Wheeler v. Catholic Archdiocese,* 65 Wn. App. 552, 829 P.2d 196, *review granted,* 120 Wn.2d 1011 (1992),[16] this court added that workers' compensation benefits which represent lost wages may be deducted from back pay awards, but workers' compensation benefits for permanent physical disabilities may not. *Wheeler,* 65 Wn. App. at 569-70. Because Boeing is a self-insurer, application of the collateral source rule here would violate the principle against double recovery. Thus, we find the collateral source rule does not apply here.

Boeing claims the court should have granted its motion to reduce Goodman's damages not only in an amount received but also in an amount to be received by Goodman. The court granted Boeing's motion only as to benefits received, denying deductions as to future workers' compensation benefits and granting instead subrogation rights. Boeing also asserts that where an employee recovers civil damages for a workplace injury, damages must be reduced by his or her workers' compensation benefits, past and future. IIA, RCW 51.24.020.

Here, the court offset $37,548.66 — the amount of IIA time-loss benefits Goodman received up to trial — against the award for lost past earnings and earnings capacity. Boeing claims that it is entitled to an additional offset of $818,859 for all of Goodman's future IIA benefits. However, after 4 years of handling the IIA claim, Boeing had only reserved $24,623 for future benefits. Because Goodman's

---

[16]*Wheeler* is currently before the Supreme Court on the issue of whether IIA benefits are protected by the collateral source rule.

workers' compensation claim had not yet closed, it was not clear whether she would be awarded a permanent total or permanent partial disability. The court thus denied an offset for future workers' compensation benefits, stating three reasons: (1) the amount of such benefits was speculative; (2) substantially all of the medical and care costs the jury awarded were not compensable under the IIA; and (3) it was unlikely Goodman would receive workers' compensation benefits for attendant care. However, the court did subrogate Boeing to any future IIA benefits Goodman may receive, ensuring against double recovery by Goodman, while also ensuring that Goodman would not be deprived of damages in the event IIA benefits do not materialize.[17] Under these facts, it was reasonable for the court to employ subrogation as a means of precluding double recovery and will reduce Goodman's damages as she receives IIA benefits.

## XIII

■■■ Goodman requests attorneys' fees on review pursuant to RAP 18.1 and RCW 49.60.030(2). As the prevailing party, Goodman is entitled to attorneys' fees. *Xieng v. Peoples Nat'l Bank*, 120 Wn.2d 512, 533, 844 P.2d 389 (1993).[18]

We affirm the trial court on all issues.

GROSSE and PEKELIS, JJ., concur.

Review granted at 125 Wn.2d 1020 (1995).

---

[17]Offsets for future payments have been denied where their recovery was uncertain. *See Tilly v. John Doe*, 49 Wn. App. 727, 734, 746 P.2d 323 (1987), *review denied*, 110 Wn.2d 1022 (1988); *see also Puget Sound Power & Light Co. v. Strong*, 17 Wn.2d 400, 404, 816 P.2d 716 (1991).

[18]Goodman states that if this court reverses on any aspect of the appeal of Boeing and Anderson, it should also reverse dismissal of her claim for punitive damages, deliberate injury, and disparate treatment. Because we do not reverse on any aspect, we do not address these issues.