[No. 27199-1-II. Division Two. February 15, 2002.]

CPL, L.L.C., *Appellant*, v. WILLIAM W. CONLEY, ET AL., *Respondents*.

*Delbert D. Miller* and *Heidi S. Batemen* (of *Miller Bateman, L.L.P.*), for appellant.

*Daniel C. Montopoli* and *G. Perrin Walker* (of *Vandeberg Johnson & Gandara*), for respondents.

SEINFELD, J. — The trial court resolved this dispute between Quad C Health Care Centers, the seller of nursing facilities, and CPL (Delaware) LLC, the purchaser of those facilities, by granting summary judgment to Quad C. Finding no disputed issues of material fact, we affirm. We also affirm the trial court's denial of Quad C's request for attorney fees.

## FACTS

In April 1998, CPL entered into purchase agreements to buy skilled nursing facilities from Quad C.[1] CPL agreed to pay $48 million for the facilities plus an additional "earnout payment," contingent on 1998 earnings meeting a certain target level. The parties developed a formula to calculate earnings before interest, taxes, depreciation, amortization, rent and central office charges (EBITDAR).

To calculate the EBITDAR, Quad C provided financial statements for the facilities from January 1, 1998, to the July 1, 1998, closing date; CPL did the same after closing. In late March 1999, the parties signed a Memorandum Agreement under which CPL agreed to pay a $2,017,468 earnout payment on or before April 1, 1999.

About three months after the payment date, CPL notified Quad C that it had discovered "computational and arithmetic errors" resulting in an incorrect EBITDAR calculation. 2 Clerk's Papers (CP) at 302. Claiming that Quad C was not entitled to an earnout payment, CPL demanded a refund of the timely payment that it had made.

Quad C responded:

In March 1999, the parties calculated the Earnout Payment,

---

[1] The purchase agreements identify AmeriPark Holding Corporation or its assignee as the purchaser, but AmeriPark later assigned all its rights and obligations to CPL.

negotiated an agreement on the amount of this payment, and entered into a Memorandum Agreement acknowledging both the amount of the payment and that the parties had no further obligation between them with respect to the Earnout Amount. Relying on that memorandum agreement, Quad-C distributed proceeds of the Earnout Payment to others involved in the transfer of the Quad-C facilities, pursuant to its agreements with these individuals.

2 CP at 304. Quad C claimed that the Memorandum Agreement was an accord and satisfaction and it refused to refund CPL's payment.

CPL sued to obtain a $1,993,360 refund. In its complaint, CPL alleged that the overpayment was the result of a mutual mistake as to the facilities' earnings, that Quad C had fraudulently or negligently withheld facts from CPL, and that Quad C had acted inequitably. After Quad C moved for summary judgment, CPL asked the court to compel arbitration of the EBITDAR calculation pursuant to the parties' purchase agreements.

The trial court denied CPL's motion to compel arbitration, granted Quad C's summary judgment motion, and denied Quad C's later request for attorney fees. CPL appeals the summary judgment order and the denial of its motion to compel arbitration. Quad C cross-appeals the court's denial of its request for attorney fees.

## ANALYSIS

### I. ALLEGED OVERPAYMENT

■■ Summary judgment is appropriate if the evidence, viewed in the nonmoving party's favor, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); *Schaaf v. Highfield*, 127 Wn.2d 17, 21, 896 P.2d 665 (1995). A material issue of fact is one upon which the litigation's outcome depends. *Capitol Hill Methodist Church v. City of Seattle*, 52 Wn.2d 359, 364, 324 P.2d 1113 (1958). The court

should grant the motion if reasonable persons could reach only one conclusion. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

## A. Mutual Mistake and Assumption of the Risk

CPL asserts that the parties were mutually mistaken about the correct EBITDAR figure and that this figure was an essential fact in the formation of the Memorandum Agreement. Quad C responds that the Memorandum Agreement represents an accord and satisfaction of disputed issues, including the EBITDAR calculation and, further, even if there was a mutual mistake, CPL is not entitled to relief because it assumed the risk of that mistake.

■ ■ "A contract is voidable on grounds of mutual mistake when both parties independently make a mistake at the time the contract is made as to a basic assumption of the contract, unless the party seeking avoidance bears the risk of the mistake." *Bennett v. Shinoda Floral, Inc.*, 108 Wn.2d 386, 396, 739 P.2d 648 (1987). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 151 (1981) ("A mistake is a belief that is not in accord with the facts."). In the contractual setting, a party bears the risk of a mistake if " 'he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient.' " *Bennett*, 108 Wn.2d at 396 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 154(b) (1981)).[2] In other words, a party's willingness to enter a contract notwithstanding limited knowledge of certain facts shows that those facts were not essential elements of the contract. *Bennett*, 108 Wn.2d at 396 ("In such a situation there is no mistake. Instead, there

---

[2] RESTATEMENT (SECOND) OF CONTRACTS § 154 provides:

"A party bears the risk of a mistake when

"(a) the risk is allocated to him by agreement of the parties, or

"(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

"(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so."

is an awareness of uncertainty or conscious ignorance of the future.").

Here, Exhibit 2.03 to the purchase agreements outlined the earnout payment calculations. It provided that CPL would provide Quad C with "monthly, quarterly and year-end Financial Statements no later than five business days after such Financial Statements are completed by [the] Purchaser." 1 CP at 9. CPL provided that information but later discovered errors in the financial information it was responsible for producing. But there is undisputed evidence that CPL knew that it could not balance its financial statements during the period it was responsible for producing the reports. This evidence supports Quad C's contention that CPL should have known that its financial information was unreliable.[3]

CPL disclaims knowledge of the financial imbalances, arguing that Quad C managers and upper level staff also were involved in the facilities' operations even after closing. But primarily it argues that it did not have knowledge of a *material* risk at the time it signed the Memorandum Agreement.

■ Where one party has a contractual duty to provide financial statements, is aware of deficiencies in its financial information, and nonetheless chooses to act on that information, we see no basis to relieve it from assuming the risk of error because it anticipated only a small discrepancy in the numbers. Clearly, CPL was aware of the size of the consequences that could flow from an error and was aware of the uncertainties. Further, we do not see how any involvement that Quad C might have had in the operation

---

[3] A CPL employee said that CPL's retained accountant, Deborah Hart, had "provided several [accounts receivable] listings in those first few months of '99, but none of them tied into our financial statements." 1 CP at 83-84. The employee reported this information to others at CPL.

Another CPL employee could not balance the accounts receivable listings for the facilities with the information Hart provided. She passed that information on to others at CPL.

And the facilities' administrators communicated to CPL their concerns about the timeliness and accuracy of the financial information they were receiving.

of the facilities after the July 1 closing date is relevant to our assumption of the risk analysis.

Finally, the cases that CPL cites are not persuasive. For example, *Simonson v. Fendell,* 101 Wn.2d 88, 675 P.2d 1218 (1984), which CPL contends contains facts "strikingly similar to this case" and supports reversal of summary judgment, is distinguishable. Appellant's Br. at 13.

In *Simonson,* there was an acknowledged mutual mistake as to the business's solvency and profitability, factors critical to the potential purchaser's decision to enter the contract to buy the business. 101 Wn.2d at 89-90. Because the mistake destroyed the essence of the parties' bargain, the *Simonson* court granted rescission. 101 Wn.2d at 91-92.

Unlike *Simonson,* the key issue here is not whether mutual mistake supports a specific form of relief. The controlling question is whether CPL assumed the risk of mistake by relying on uncertain financial information.

In *Public Utility District No. 1 v. Washington Public Power Supply System (WPPSS),* WPPSS entered into "Participants' Agreements" for the construction of nuclear plants. 104 Wn.2d 353, 357, 705 P.2d 1195, 713 P.2d 1109 (1985). When the project encountered difficulties, WPPSS executed various loan contracts. *WPPSS,* 104 Wn.2d at 357-58. After the Washington Supreme Court invalidated the Participants' Agreements, WPPSS contended that the parties to the loan contracts were mutually mistaken as to a basic assumption of those contracts, i.e., the validity and enforceability of the Participants' Agreements. *WPPSS,* 104 Wn.2d at 361.

 The court concluded that WPPSS bore the risk of mistake by making the loan contracts at a time when the completion of the nuclear plants was in question and when a lawsuit questioning the legal existence and corporate powers of WPPSS was pending. *WPPSS,* 104 Wn.2d at 363. "A party who incurs an obligation with limited knowledge, conscious disregard of surrounding circumstances and awareness of uncertainty must bear the consequences of its

decision." *WPPSS*, 104 Wn.2d at 363. *See also Bennett*, 108 Wn.2d at 388, 397 (upholding validity of releases signed by personal injury victims when they knew they were injured but did not know extent or consequences of injuries because they bore risk by executing releases when they were aware of uncertainty); *Tiegs v. Boise Cascade Corp.*, 83 Wn. App. 411, 414, 426-27, 922 P.2d 115 (1996) (upholding agricultural lease that was contingent on landlord finding "adequate water" for property as landlord alone assumed risk of contaminated water), *aff'd sub nom. Tiegs v. Watts*, 135 Wn.2d 1, 954 P.2d 877 (1998). Similarly here, CPL executed the Memorandum Agreement in a climate of uncertainty concerning the accuracy of its financial information.

■ Finally, CPL concedes that the record lacks evidence of fraud or deliberate manipulation. But it continues to assert that Quad C acted inequitably by withholding material facts, suggesting that this would support reformation even if there was only a unilateral mistake on its part. *See Wash. Mut. Sav. Bank v. Hedreen*, 125 Wn.2d 521, 525, 886 P.2d 1121 (1994) (unilateral mistake may support contract reformation if other party engaged in fraud or inequitable conduct).

CPL has failed to raise any genuine issues of material fact as to Quad C's inequitable behavior. A party acts fraudulently or inequitably when it conceals a material fact from another party to whom it has a duty to disclose that information. *Wash. Mut.*, 125 Wn.2d at 526. CPL suggests that Quad C acted improperly in the way that it dealt with concerns about a November revenue "spike." But CPL's retained accountant, Deborah Hart, gave Quad C a satisfactory explanation for the spike. Thus, there was no reason for Quad C to take further action.

■ Nor has CPL established that Quad C had a duty to inform CPL of any problems. Further, because Hart was CPL's agent, her knowledge of any problems is imputable to CPL. *See Goodman v. Boeing Co.*, 75 Wn. App. 60, 85, 877 P.2d 703 (1994) (agent's knowledge will be imputed to principal "only where it is relevant to the agency and the

matters entrusted to the agent"), *aff'd*, 127 Wn.2d 401, 899 P.2d 1265 (1995). *See also Peck v. Siau*, 65 Wn. App. 285, 291, 827 P.2d 1108 (1992) (same).

 As there is undisputed evidence that before CPL entered the Memorandum Agreement, it had information showing the unreliability of its financial data, it is appropriate that it "bear the consequences of its decision" to treat its limited knowledge as sufficient. *WPPSS*, 104 Wn.2d at 363. Because CPL assumed this risk, the doctrine of mutual mistake does not void the Memorandum Agreement.

B. Accord and Satisfaction

Alternatively, Quad C argues that the Memorandum Agreement and the $2,017,468 payment constituted an accord and satisfaction that resolved all disputes about the earnout payment and about vacation and sick leave benefits under section 10.01(i) of the purchase agreements. Because we find that the assumption of the risk doctrine resolves CPL's request for relief, we need not reach Quad C's alternative argument.

## II. MOTION TO COMPEL ARBITRATION

CPL contends that Quad C triggered the arbitration clause in the purchase agreements by raising EBITDAR calculation challenges during discovery in this case. CPL further disputes Quad C's assertion that CPL waived its arbitration clause claim by filing this suit.

 We review arbitrability questions de novo. *Stein v. Geonerco, Inc.*, 105 Wn. App. 41, 45, 17 P.3d 1266 (2001); *Kamaya Co. v. Am. Prop. Consultants, Ltd.*, 91 Wn. App. 703, 713, 959 P.2d 1140 (1998).

> In determining whether the two parties agreed to arbitrate the particular dispute, we consider four guiding principles: 1) the duty to arbitrate arises from the contract; 2) a question of arbitrability is a judicial question unless the parties clearly provide otherwise; 3) a court should not reach the underlying merits of the controversy when determining arbitrability; and 4) as a matter of policy, courts favor arbitration of disputes.

*Stein*, 105 Wn. App. at 45-46.

■■■ The purchase agreements contain an arbitration clause[4] that requires the parties to submit any disputes regarding the EBITDAR measurement to arbitration. But as we note in conjunction with our attorney fee discussion, the dispute here centers on the Memorandum Agreement, not on the purchase agreements. Further, the record lacks support for CPL's contention that Quad C's conduct in discovery triggered the arbitration clause.

Quad C's responses to interrogatory questions indicate that it had concerns about the EBITDAR calculation before it executed the Memorandum Agreement. But these responses were in support of Quad C's claim that there was a bona fide dispute that the Memorandum Agreement resolved. Further, Quad C first objected to the interrogatories because it believed the amount was negotiated rather than "calculated," but then, while preserving its objection, it asserted that the calculations should be revisited.

Thus, the trial court did not err in denying CPL's motion to compel arbitration.

### III. ATTORNEY FEES

Quad C cross-appeals the trial court's denial of its motion for attorney fees and costs, asserting that as the prevailing party, it is entitled to such fees under RCW 4.84.330 and under the purchase agreements.

---

[4] The arbitration clause provides:

> Access to Information; Disputes. Purchaser shall provide Seller with monthly, quarterly and year-end Financial Statements no later than five business days after such Financial Statements are completed by Purchaser. Purchaser shall give Seller reasonable access to review all books and records of the SNFs. *If, after review of the Financial Statements, the parties have a dispute with regard to the Actual EBITDAR measurement, the parties shall submit the dispute to a nationally recognized accounting firm* not engaged by either Seller or Purchaser (the "Auditor"), whose decision shall be final and binding on both parties. The Auditor shall provide the parties with a written report no later than 45 days after submission of the dispute to the Auditor. The Auditor shall use the same methodology that is outlined in this Exhibit 2.03. The parties will divide equally all fees and charges of the Auditor.

1 CP at 9-10 (emphasis added).

■ ■ Generally, Washington courts will not award attorney fees as part of litigation costs absent a contractual, statutory or equitable ground. *Tradewell Group, Inc. v. Mavis*, 71 Wn.App. 120, 126, 857 P.2d 1053 (1993). RCW 4.84.330 provides for an award of attorney fees and costs to the prevailing party in any action "on a contract."[5] "[A]n action is on a contract if the action arose out of the contract and if the contract is central to the dispute." *Seattle-First Nat'l Bank v. Wash. Ins. Guar. Ass'n*, 116 Wn.2d 398, 413, 804 P.2d 1263 (1991).

■ The purchase agreements contained an attorney fees provision, awarding fees to the prevailing party in any action "instituted to enforce or interpret any of the terms of this Agreement." 1 CP at 142.[6] The trial court denied Quad C's request for attorney fees apparently concluding that the Memorandum Agreement, which has no attorney fees provision, trumped the purchase agreements. We agree.

CPL brought this action asserting mutual mistake in the formation of the Memorandum Agreement. And we resolve this matter based upon a finding that CPL assumed the risk when it entered the Memorandum Agreement. Thus, it is reasonable to conclude that the action was not "instituted to enforce or interpret" a term of the purchase agreements.

---

[5] RCW 4.84.330 provides:

In any action on a contract . . . entered into after September 21, 1977, where such contract . . . specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of such contract . . . , shall be awarded to one of the parties, the prevailing party, whether he is the party specified in the contract . . . or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements.

. . . .

As used in this section "prevailing party" means the party in whose favor final judgment is rendered.

[6] The attorney fees clause provides:

21.11 <u>Attorney Fees Recoverable</u>. In the event *any suit or action is instituted to enforce or interpret any of the terms of this Agreement*, including any action or participation in or in connection with a case or proceeding under any Chapter of the Bankruptcy Code or any successor statute, the prevailing party shall be entitled to such sum as the court may adjudge reasonable as attorney fees in such suit, action or proceeding or upon any appeal from any judgment, order or decree entered therein.

1 CP at 142 (emphasis added).

Rather, the purpose of the action was to void the subsequent and separate Memorandum Agreement that settled on an EBITDAR figure.

As the Memorandum Agreement did not contain an attorney fees provision and there is no statutory support for an attorney fee award, the trial court did not err in denying fees. For the same reason, neither party is entitled to attorney fees on appeal.

We affirm the grant of summary judgment and the denial of attorney fees.

ARMSTRONG, C.J., and BRIDGEWATER, J., concur.