**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| SUSAN PURNELL-CARLSON, | ) | No. 76354-7-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| THE BOEING COMPANY, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Respondent. | ) | FILED: March 18, 2019 |
| | ) | |

LEACH, J. — In this employment discrimination case, Susan Purnell-Carlson (Carlson) appeals a judgment entered after a jury verdict in favor of The Boeing Company. She challenges trial court decisions about requests for summary judgment, a directed verdict, a judgment notwithstanding the verdict, and a new trial. She also challenges certain jury instructions and various trial court evidentiary rulings. Because Carlson has not shown that she is entitled to appellate relief on any issue, we affirm.

## FACTS

Carlson started working at Boeing in November 1996. On her preemployment questionnaire, she noted that she had three months of treatment in 1990 for posttraumatic stress disorder (PTSD) resulting from her divorce.

Carlson advanced through several different business- and engineering-related positions at Boeing.

While at Boeing, Carlson took two medical leaves related to stress-induced depression and anxiety. She first took leave from June to August 2001. On her return-to-work form, her provider noted "R/O PTSD" (rule out PTSD) as an "impression," diagnosed her with major depression, and indicated that she was ready to work but that she should continue counseling.

Carlson took a second leave from mid-April through early July 2010 for a "stress incident" at work and as medical leave for other issues. In her Department of Labor and Industries report, Carlson described the stress incident as an anxiety attack stemming from a conflict over resources for a project. She did not request any disability accommodation. Boeing did not ask if she needed help transitioning back to work. Carlson talked to her manager about the incident and, once she returned, she asked him how to proceed with work.

In 2012, Carlson accepted a position as engineering project manager on the team being assembled by senior project manager Richard Heckt to troubleshoot the 787 airliner program. Heckt and Carlson agree that they initially had a good working relationship. Heckt testified that Carlson "did really well" when she started with the new group. Carlson never told Heckt about a diagnosis of anxiety disorder or PTSD. Nor did she ever tell him that she had

taken two leaves of absence for stress-related illnesses. And Heckt did not have access to her medical files.

From March to August 2013, Carlson's and Heckt's interactions grew tenser. During this time, Carlson e-mailed higher level managers indicating that she struggled with stress and with working with Heckt. She never contacted Human Resources (HR) about accommodation.

Heckt and Carlson disagree about certain events occurring between March and August 2013. They agree that a March 2013 meeting marked the turning point in their work relationship. Carlson left the meeting early.[1] During the meeting, Heckt thought Carlson appeared upset. The anger she directed toward Heckt surprised him. Carlson testified that she left the meeting early to "decelerate" the situation and prevent a stress incident. But her departure also prematurely ended the meeting.[2]

Carlson and Heckt agree that their relationship soured after this meeting. They both point to the same e-mail exchange. Heckt asked Carlson to "please adhere to management direction and do not freelance on these charts." Carlson replied she would follow the "old way" and "not streamline, lean out or otherwise

---

[1] The meeting appears to have occurred in March 2013, although in her brief Carlson identifies it as occurring in April 2013. Her cited pages of the record do not indicate this as the month of the meeting.

[2] The parties differ in their testimony as to whether Carlson "packed up her computer" before leaving or slipped out, receiving her computer later from another attendee.

improve work processes in any way that is visible to anyone other than myself and my direct manager in private." She added, "Do I have to write this 100 times on the chalkboard? Have a good day, Rick." Heckt found this e-mail adversarial. Carlson described it as an effort to restore the relationship.

Carlson testified that after the March 2013 meeting she "felt threatened" by Heckt. Before her August 2013 interim performance evaluation, she wrote comments in her journal reflecting her anger toward Heckt. She planned to "stand up for herself" at the meeting despite what she felt was "mistreatment." On August 9, 2013, Carlson met with Heckt and another manager, Julius Rivers, for her interim performance evaluation.

Carlson testified that she felt tension in the meeting room as a result of the March meeting. She also said that the physical experience of being present for her interim performance evaluation differed from her other experiences with Heckt. She testified that Heckt's statements during the meeting triggered a memory of her teenage sexual abuse. She said that she stood up and imitated his mannerisms as a way to let Heckt know that she felt threatened by him. She believed, given his response, that he found this funny. So she imitated him a second time. Next, she told Heckt that he made her "feel like [she] want[ed] to get a gun or a knife" and that she felt "a need to defend" herself.[3] Carlson

---

[3] All three witnesses, Carlson, Heckt, and Rivers, agree she made these statements. Both Rivers in his e-mail about the meeting and Carlson in her

testified that after these statements, she told Heckt that she was not making a threat. She also told Heckt that she was a "battered woman" and he could not treat her like that. Heckt testified that both Heckt and Rivers told her that her statement was a "threat of violence which is not acceptable." The meeting continued after this exchange without any more discussion about how Heckt perceived her words. Carlson viewed the evaluation she received at the meeting as being particularly negative.

About two hours after she left the meeting, Carlson sent an e-mail to Heckt and Rivers. In her e-mail, she said that Heckt's "aggressive behaviors [made her] fearful and . . . want to defend" herself. In addition, she stated that she felt like she "need[ed] to be armed and ready to take action to do so." She noted in her e-mail that she "did not say this to threaten" Heckt but that "[i]t was a description of [her] feelings and fear of harm" which caused her to think that she needed "to be ready to combat." She ended the e-mail with a request to be moved to a different organization.

The day after the interim performance meeting, Carlson sent an e-mail to a higher level manager describing her difficulties working with Heckt. She said that if she was not reassigned, she would likely leave the company. She also e-

---

statement to the internal investigator reported that she said Heckt's behavior made her want to "shoot or stab" him. However, Carlson contends that she did not actually make this statement, and Heckt does not indicate that she did.

mailed Dan Larsen of HR and asked for information for the "mitigation . . . available . . . to buffer employees from" the aggressive use by managers of overtime disciplinary processes. Larsen offered to meet with her in person. She did not follow up. She took the following week off. In none of her correspondence with Heckt, HR, or any other Boeing employee after this incident did she mention PTSD.

Heckt became increasingly concerned about Carlson's statement after the meeting because of how "direct" it was, how it "focus[ed] in on [his] behaviors" in "a way that was kind of inspiring her to violence." On Monday, August 12, he reported the statement to HR and requested an investigation by Boeing security. After Carlson returned to work, she and Heckt met twice. During one meeting, Heckt issued a disciplinary memo for unauthorized overtime. During the second, he described his expectations for her behavior going forward. She said nothing suggesting PTSD as a cause of her conduct.

Carlson's statements caused Boeing to initiate two separate procedures. The first was a threat management process through the Employee Assistance Program (EAP) that attempts to prevent the threat from becoming actual violence. This process resulted in psychologist Dr. Tyson Bailey's report. The second was the disciplinary investigation that provided information to the disciplinary board about the actual circumstances of the statements.

As a part of the threat management process, Boeing suspended Carlson and directed her to report to an EAP medical provider retained by it, Dr. Bailey. Carlson testified that she was under the impression that Boeing would have access to Bailey's report because she signed Bailey's release form and that she believed she "told Boeing through Tyson Bailey" of his diagnosis. But the release form she signed for EAP stated that only a limited amount of information would be shared with a supervisor or other authorized representative. This limited information was (1) whether or not Carlson contacted EAP, (2) whether or not EAP recommended treatment, (3) whether or not Carlson participated and complied with any treatment plan, and (4) any other information Carlson indicated. The form did not include any authorization to release information about any diagnosis. Carlson did not modify the form to authorize disclosure of any additional information to Boeing. Carlson also admitted that she never asked Boeing for an "accommodation."

On September 10, 2013, Bailey submitted his evaluation of Carlson to Boeing medical and EAP. Bailey reported that Carlson expressed "deep regret" over her statements. He found that she was at a "low risk for engaging in violence toward her coworkers" and that as a result of his analysis, he had "no significant concerns" regarding her "potential for violence toward self or others." He also found "[n]o evidence . . . that would suggest Ms. Carlson has a pattern of

making threatening statements." His "diagnostic impression" was "[a]nxiety disorder not otherwise specified." He also noted "[p]osttraumatic features that do not currently qualify for a PTSD diagnosis." Bailey's report does not say that Carlson's anxiety caused her statements about the gun and the knife, but he testified that her "frustration with her manager" might be the underlying cause of the conduct. Carlson did not tell Bailey that she thought her anxiety caused her to make these statements.

During his evaluation, Bailey asked Carlson about her family and past history. She reported sexual abuse by a guardian. Because he was only evaluating her risk as a threat, he did not focus on whether she met the criteria for a PTSD diagnosis.

Two years later, Carlson retained an expert witness, psychologist Dr. Christmas Covell, who diagnosed her, for the first time, with PTSD. Covell also concluded that during August 2013, Carlson was probably "experiencing symptoms of post traumatic stress . . . that led to her acting out . . . and making the statement she made."

After the August 2013 meeting, Boeing's disciplinary investigation under Robert LeBlanc proceeded independent from, but at the same time as, the threat management assessment. Carlson told LeBlanc that she thought abuse in her past caused her to experience a high level of defensiveness. She did not tell him

she suffered from a "mental health problem, disorder impairment or anything of the sort." And she did not describe the perceived threatening statement as the result of an out-of-body experience or a flashback. Nor did she tell LeBlanc she needed an accommodation.

LeBlanc drafted a statement for Carlson based on his interview with her. He included in the draft a statement that Carlson said she wanted to "get a gun and shoot [Heckt] or stab [him]." Carlson read and signed the statement. LeBlanc reviewed HR reports and interviewed additional witnesses, including Heckt. He concluded that Carlson had threatened violence and violated employment policy at Boeing.

Boeing's Employee Corrective Action Review Board (ECARB) decides what disciplinary actions to take for serious violations of employment policy, including threats of violence. The group includes members of management and a senior member of HR who serves as chairperson. ECARB follows Boeing's Employee Corrective Action Process Requirements (ECAPR). ECAPR defines a "threat" as "[a]ny communication, including body language, that involves a threat to harm and may cause fear or reasonable concern for the safety, health, or well-being of others." A threat generally results in a suspension but if an "aggravating factor," such as a "directed specific threat to harm," was involved, ECARB typically discharges the employee.

LeBlanc's report contributed to ECARB's review of Carlson. Because of privacy considerations, ECARB did not review Bailey's report or any other medical information. Carlson did not authorize ECARB to review Bailey's report. She did not provide information about her mental health to HR, LeBlanc, or ECARB. Boeing does not automatically release this kind of information to managers or investigators and without an authorization, medical personnel did not feel free to share the information.

ECARB met on October 2, 2013, and voted to discharge Carlson. It found her statement at the August 2013 meeting and her subsequent e-mail included threats aggravated by their specific nature. Boeing terminated her on October 14, 2013.

Carlson filed a complaint against Boeing with the Equal Employment Opportunity Commission (EEOC). She alleged employment discrimination on the basis of sex, age, and retaliation but did not claim disability discrimination.[4] In July 2014, she followed up with a narrative letter that described her grievance with Boeing. And again she did not complain about disability discrimination. Boeing advised Carlson about its in-house process for appealing her firing. She did not pursue this process.

---

[4] The trial court noted, "It appears to be undisputed in the record that disability discrimination [was] not brought to the EEOC's attention and would not have been considered by them." Carlson's charge of discrimination was signed on November 18, 2013.

More than a year after her termination, Carlson sued Boeing. She claimed that Boeing had violated the Washington Law Against Discrimination (WLAD)[5] by discriminating against her because of her disability. This was the first time she asserted disability discrimination. Both parties moved for summary judgment. The trial court denied the motions because of disputed issues of material fact. After a trial, the jury returned a verdict in favor of Boeing. Afterward, Carlson asked for judgment as a matter of law and for a new trial. The trial court denied both requests. Carlson appeals.

## ANALYSIS

Carlson appeals the trial court's denial of her motion for summary judgment, denial of her motion for judgment as a matter of law (judgment notwithstanding the verdict), and denial of her motion for a new trial. She claims that the trial court should have decided, as a matter of law, that Boeing fired her because of a disability in violation of the WLAD. She asks this court to remand for a damages trial. Alternatively, she asks this court to grant her a new trial because, she claims, the trial court abused its discretion when making several evidentiary determinations and when instructing the jury.

Carlson fails to meet her burden on any of her claims. We affirm.

_____

[5] Ch. 49.60 RCW.

## Motion for Summary Judgment

Carlson appeals the trial court's denial of her motion for summary judgment. An appellate court will review the denial of a summary judgment request if based upon a pure question of law.[6] But an appellate court will not review the denial of this request if the trial court denies it because it finds that a dispute about material facts exists.[7] Here, the trial court denied the summary judgment because the parties presented evidence disputing material facts.[8] So we decline to review this decision.

## Motion for Judgment as a Matter of Law

Carlson claims the trial court should have granted her postverdict request for judgment as a matter of law (judgment notwithstanding the verdict) because the evidence showed that Boeing discriminated as a matter of law when it fired her. But substantial evidence presented to the jury supported a finding that Boeing did not have notice of her claimed disability. As a result, this claim fails.

When we review a trial court's decision to deny a request for judgment as a matter of law, we use the same standard as the trial court.[9] Courts grant a motion for judgment as a matter law only if "after viewing the evidence in the light

[6] Robb v. City of Seattle, 176 Wn.2d 427, 433, 295 P.3d 212 (2013).
[7] Canfield v. Clark, 196 Wn. App. 191, 194, 385 P.3d 156 (2016).
[8] In her brief, Carlson periodically states, "That is not material" after disputed facts. This is not sufficient to demonstrate that there were no actual material facts in dispute.
[9] Hizey v. Carpenter, 119 Wn.2d 251, 271, 830 P.2d 646 (1992).

most favorable to the nonmoving party and drawing all reasonable inferences," no substantial evidence exits to sustain a verdict for the nonmoving party.[10] No substantial evidence exists when the evidence is insufficient to persuade a fair-minded person of the truth of the declared premise.[11] We do not substitute our own judgment for the jury's. A court may grant a request for judgment as a matter of law only if "there is no doubt as to the proper verdict."[12]

The WLAD provides employees with "[t]he right to obtain and hold employment without discrimination."[13] Specifically, an employer may not "discharge . . . any person from employment because of . . . the presence of any sensory, mental, or physical disability."[14] The WLAD defines a "disability" as "the presence of a sensory, mental, or physical impairment that: (i) [i]s medically cognizable or diagnosable; or (ii) [e]xists as a record or history; or (iii) [i]s perceived to exist whether or not it exists in fact."[15] And it defines "impairment" to include "[a]ny mental, developmental, traumatic, or psychological disorder, including . . . emotional or mental illness."[16] To be disabling, the impairment

---

[10] Schmidt v. Coogan, 162 Wn.2d 488, 491, 173 P.3d 273 (2007) (citing Hizey, 119 Wn.2d at 271-72).

[11] Martini v. Boeing Co., 88 Wn. App. 442, 451, 945 P.2d 248 (1997), aff'd, 137 Wn.2d 357, 971 P.2d 45 (1999).

[12] Schmidt, 162 Wn.2d at 493; Burnside v. Simpson Paper Co., 123 Wn.2d 93, 108, 864 P.2d 937 (1994).

[13] RCW 49.60.030(1)(a).

[14] RCW 49.60.180(2).

[15] RCW 49.60.040(7)(a).

[16] RCW 49.60.040(7)(c)(ii).

must prevent or severely restrict the individual from engaging in a major life activity. The impairment's impact must also be permanent or long-term.[17]

A disabled employee has three potential claims against an employer who violates the WLAD: disparate impact, disparate treatment, and failure to accommodate.[18] Carlson asserted disparate treatment and failure to accommodate claims. Both claims required that she establish a disability and connect that disability to her work performance.

Both of Carlson's claims fail because she did not establish, as a matter of law, that Boeing had notice of her disability. Carlson's conduct was first linked to a PTSD diagnosis more than a year after she was terminated. Boeing's and EAP's records do not include any reported diagnosis of PTSD, do not suggest that accommodation should be made at work for Carlson's anxiety, and do not link PTSD or anxiety to the conduct that led to her firing. Even Bailey's report about her conduct did not include a PTSD diagnosis. And it did not connect her conduct to any sort of disability. More than a year after the firing, Covell provided the first claimed connection between PTSD and Carlson's conduct. Even if ECARB and Boeing's administration had access to all of Carlson's files when she was fired, they would still not have had any information connecting PTSD to the conduct for which it fired her.

---

[17] Burchfiel v. Boeing Corp., 149 Wn. App. 468, 481, 205 P.3d 145 (2009).
[18] Fey v. State, 174 Wn. App. 435, 447, 300 P.3d 435 (2013).

Carlson fails to demonstrate that Boeing had notice of her disability and therefore fails to establish a basic element required to prove disability discrimination under either theory. For this reason, her request for judgment as a matter of law fails. It fails for other reasons as well.

A. *Disparate Treatment*

With jury instruction 11, the court told the jury what Carlson had to prove to establish her disparate treatment claim:

> To establish her "disparate treatment" claim, Ms. Carlson has the burden of proving each of the following propositions:
>
> (1) That she has a disability;
>
> (2) That she is able to perform the essential functions of her job; and
>
> (3) That her disability was a substantial factor in Boeing's decision to terminate her.
>
> If you find from your consideration of all of the evidence that each of these propositions has been proved, then your verdict should be for Ms. Carlson on this claim. On the other hand, if any of these propositions has not been proved, your verdict should be for Boeing on this claim.

Carlson has not challenged this instruction. So we review the record to see if the record includes substantial evidence supporting a conclusion that Carlson did not prove one of the three propositions stated in jury instruction 11. Substantial evidence supports a conclusion that Carlson did not prove that her disability was a substantial factor in Boeing's decision to fire her.

-15-

Carlson provided some evidence of disability since her expert testified that she had PTSD.[19] She provided some evidence linking her disability to her job performance since her two earlier leaves of absence were, at least in part, the result of stress from work. Finally, she provided some, albeit contested, evidence that her PTSD caused the conduct that led to her termination: Covell testified that Carlson's PTSD had likely been triggered at the meeting by Heckt's behavior. But Boeing presented substantial evidence sufficient to persuade a reasonable person that Carlson's conduct was the result of her ongoing anger at Heckt and not her PTSD. And this evidence supports a conclusion that Carlson did not prove a required element of her disparate treatment claim. The trial court correctly denied her request for judgment as a matter of law on this claim.

*B. Failure To Accommodate*

With jury instruction 12, the court told the jury what Carlson had to prove to establish her "failure to reasonably accommodate" a disability claim,

> To establish her "failure to reasonably accommodate" a disability claim, Ms. Carlson has the burden of proving each of the following propositions:
>
> (1) That she had an impairment that is medically recognizable or diagnosable or exists as a record or history; and
>
> (2) That either

---

[19] She received this diagnosis after she was terminated.

> (a) Ms. Carlson gave Boeing notice of the impairment; or
>
> (b) no notice was required to be given because Boeing knew about Ms. Carlson's impairment; and
>
> (3) That the impairment had a substantially limiting effect on Ms. Carlson's ability to perform her job; and
>
> (4) That she would have been able to perform the essential functions of the job in question with reasonable accommodation; and
>
> (5) That Boeing failed to reasonably accommodate the impairment.
>
> In determining whether an impairment has a substantially limiting effect, a limitation is not substantial if it has only a trivial effect.
>
> If you find from your consideration of all of the evidence that each of these propositions has been proved, then your verdict should be for Ms. Carlson on this claim. On the other hand, if any of these propositions has not been proved, your verdict should be for Boeing on this claim.

Again, Carlson has not challenged this instruction. So we review the record to see if the record includes substantial evidence supporting a conclusion that Carlson did not prove one of the five propositions stated in jury instruction 12.

The record includes substantial evidence supporting the conclusion that Boeing did not have notice of her disability and the need for accommodation. Heckt did not know about her anxiety, depression, or PTSD. Nor did ECARB. Further, even EAP, whose counselors had knowledge of the stress incidents that

-17-

contributed to her need for leave time and who recommended PTSD be ruled out, did not find a need for or recommend in-house accommodation. Instead, they suggested counseling as the plan for addressing her depression and anxiety.

Carlson relies on an "imputed knowledge" theory to show that Boeing had notice as a matter of law. She cites three cases to support her argument: Goodman v. Boeing Co.,[20] Kimbro v. Atlantic Richfield Co.,[21] and Martini v. Boeing Co.[22] None supports her claim. In each case, a supervisor knew about the employee's disability and its impact on the employee's ability to work. In Goodman, Goodman provided evidence about her supervisors' awareness of the exacerbation of her arthritis caused by her job and that she had requested a transfer because of the disability.[23] In Kimbro, the plaintiff's immediate supervisor counseled him about the impact of his disability, cluster headaches and migraines, on his work.[24] In Martini, EAP knew that Martini's depression was directly related to his work, and Boeing indicated it planned to transfer him as a result of his requests.[25]

---

[20] 75 Wn. App. 60, 877 P.2d 703 (1994), aff'd, 127 Wn.2d 401, 899 P.2d 1265 (1995).
[21] 889 F.2d 869 (9th Cir. 1989).
[22] 88 Wn. App. 442, 945 P.2d 248 (1997), aff'd, 137 Wn.2d 357, 971 P.2d 45 (1999).
[23] Goodman, 75 Wn. App. at 64.
[24] Kimbro, 889 F.2d at 872-73.
[25] Martini, 88 Wn. App. at 447, 455, 458-59.

In contrast, Carlson did not show that Heckt or EAP knew she had PTSD and that it affected her ability to work. Carlson never told Boeing that she made her transfer request to accommodate her PTSD. Because substantial evidence supports a conclusion that Boeing did not have direct or constructive notice of her PTSD and that it affected her work, Carlson fails to establish that Boeing failed to accommodate her disability as a matter of law.[26] The trial court correctly denied her request for judgment as a matter of law on this claim.

### Motion for a New Trial

Carlson claims that the court's incorrect decisions about evidentiary issues and jury instructions sufficiently prejudiced her to require a new trial. We review the denial of a motion for a new trial for abuse of discretion.[27] For this court to find the trial court abused its discretion by not granting a new trial, an appellant must demonstrate that the court's decisions during trial prevented her from having a fair trial.[28]

---

[26] Since Carlson fails to establish that Boeing knew of her disability and its relationship with her work and thus fails to show a duty to accommodate was triggered, we need not address the issue of whether she could perform essential functions of her job.

[27] Alum. Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wn.2d 517, 537, 998 P.2d 856 (2000).

[28] Alum. Co. of Am., 140 Wn.2d at 537.

*A. Jury Instructions*

Jury instructions must allow each party to present to the jury its theory of the case.[29] The sufficiency and accuracy of jury instructions present questions of law that this court reviews de novo.[30] Misleading instruction are always insufficient.[31] If an instruction is wrong, the party challenging it must also show prejudice that affected, or presumptively affected, the trial's outcome to receive appellate relief.[32]

i. <u>Jury Instruction 21[33]</u>

Carlson challenges jury instruction 21, which told the jury that "an employer who obtains information regarding the medical condition or history of any employee shall . . . treat that information as a confidential medical record" unless the employee authorizes the employer to release it to a particular individual.

We do not need to decide if this instruction correctly stated the law because Carlson has not shown that this instruction prejudiced her. As discussed above, neither Heckt nor ECARB knew about Carlson's disability when

---

[29] <u>Hue v. Farmboy Spray Co.</u>, 127 Wn.2d 67, 92, 896 P.2d 682 (1995); <u>Havens v. C&D Plastics, Inc.</u>, 124 Wn.2d 158, 165, 876 P.2d 435 (1994).
[30] <u>State v. Becklin</u>, 163 Wn.2d 519, 525, 182 P.3d 944 (2008); <u>Cox v. Spangler</u>, 141 Wn.2d 431, 442, 5 P.3d 1265 (2000), 22 P.3d 791 (2001).
[31] <u>Hue,</u> 127 Wn.2d at 92; <u>Havens</u>, 124 Wn.2d at 165.
[32] <u>Thomas v. French</u>, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983).
[33] Carlson appears to be referring to jury instruction 21 when she discusses jury instruction 22 in her brief.

Boeing fired her. Even if the court had not given this instruction and the jury could presume Boeing could freely share this information, undisputed evidence established that the ECARB was not aware of Dr. Bailey's diagnosis and so could not have relied on it when making its decision.

ii. Jury Instruction 20[34]

Carlson claims that the court erred by instructing the jury that "[a]n employer is not required to provide a disabled employee with an accommodation unless the accommodation is medically necessary."

Carlson confuses accommodation with diagnosis. The WLAD does not require a medical diagnosis for a worker to establish she suffers from a disability. But Washington courts do require an accommodation be "medically necessary" for an employer to have a duty to accommodate that employee's disability.[35] The instruction accurately states the legal requirement that an employee must demonstrate "a nexus between a disability and the need for accommodation."[36] Carlson does not provide any contrary authority.

Carlson further claims that jury instruction 20 conflicts with jury instruction 17. It does not. Jury instruction 17 states that an "employer must provide

---

[34] Carlson appears to be referring to this instruction when she claims the court erroneously allowed jury instruction 21.

[35] Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 192-93, 23 P.3d 440 (2001).

[36] Riehl v. Foodmaker, Inc., 152 Wn.2d 138, 148, 94 P.3d 930 (2004).

-21-

reasonable accommodation for an employee" unless it will impose an "undue hardship on the employer." It also identifies factors to consider to evaluate an undue hardship claim, states that "[t]here may be more than one reasonable accommodation of a disability," and provides examples of accommodations that can allow the "person to perform the essential functions of the job." None of this conflicts with the requirement for "medical necessity" identified in jury instruction 20. Rather, jury instruction 20 provides an additional clarification regarding exactly what type of accommodation is required.

Since jury instruction 20 is an accurate statement of Washington law, Carlson's challenge to it fails.

iii. Proposed Jury Instruction 14

Carlson claims that the trial court should have instructed the jury that "[i]t is not a defense to plaintiff's claims that Boeing would have fired an employee without an impairment for the same conduct Boeing alleges it fired plaintiff for."

Carlson fails to show that the absence of this instruction prejudiced her. This instruction addresses one defense Boeing asserted to the disparate treatment claim. As discussed above, Carlson did not demonstrate that ECARB had actual knowledge of her disability. An instruction about Boeing's defense would not assist Carlson when she failed to present evidence sufficient to prove one element of her claim.

iv. Proposed Jury Instruction 13

Carlson claims that the trial court should have instructed the jury that an "employer includes any person acting in the interest of the employer, directly or indirectly." She contends that her theory of the case required that the jury understand that "an employer [cannot] create subdivisions within itself."

Again, Carlson fails to establish prejudice. As indicated above, Carlson does not establish that Boeing or EAP had information linking her conduct to PTSD at the time Boeing fired her. This instruction would not remedy that failure.

B. *Admission of Evidence*

A party challenging the admission of evidence must show that the trial court abused its discretion and that this decision prejudiced that party.[37]

Evidence of ECARB's Lack of Knowledge of Carlson's Medical History

According to Carlson, the court abused its discretion by admitting Boeing's evidence and argument that ECARB did not know the content of EAP's files or Bailey's report.

Carlson failed to establish that this admission prejudiced her. As indicated above, Carlson did not show that any of the information possessed by EAP and by Boeing at the time of termination, including Bailey's report, established that Carlson had PTSD or that it caused her conduct. Even if the evidence she

---

[37] Farah v. Hertz Transporting, Inc., 196 Wn. App. 171, 177, 383 P.3d 552 (2016); Burnside, 123 Wn.2d at 107.

contests was not admitted and the jury assumed ECARB had access to Bailey's and EAP's files, Carlson's evidence did not prove either disparate treatment or failure to accommodate.

### i. Carlson's Failure To Appeal Her Termination

Carlson also challenges the admission of evidence about her decision not to appeal her firing through Boeing's internal process. She claims the "prejudice outweighed any probative value" of the evidence. She has not shown how this decision prejudiced her. As discussed above, Carlson did not establish a prima facie case for discrimination because she did not establish that Boeing had notice. Even if the trial court excluded this evidence, Carlson could not have proved disability discrimination.

### ii. Testimony by Cain and LeBlanc.

Carlson also challenges testimony from Boeing's medical officer, Dr. Laura Cain, and Boeing's security officer, Robert LeBlanc. She claims both provided "expert testimony" in the form of opinions about aspects of the case for which they did not have personal knowledge.

Carlson asserts that Cain, in discussing Bailey's report, did not testify based on personal knowledge. However, Cain relied on her personal experience working as a medical officer when she testified about Dr. Bailey's report and how Boeing officials would have understood it. So her testimony was not improperly

admitted expert testimony. Boeing's failure to identify Cain as an expert witness should not have negatively impacted Carlson's trial preparation. Cain is Boeing's medical officer, and Carlson should have fully anticipated Cain would testify regarding the medical procedures and determinations made by EAP.

Further, Carlson did not establish that she was prejudiced by Cain's testimony. The testimony did not impair Carlson's ability to prove a prima facie case. Rather, as discussed above, she failed to demonstrate that Boeing knew about her disability and its connection to her behavior.

Carlson also asserts that Boeing's security investigator, LeBlanc, offered impermissible expert testimony. LeBlanc testified about Carlson's violation of Boeing's procedures. As the primary investigator following up on reports that Carlson made threatening statements and as a security officer with Boeing, LeBlanc could testify about how his personal experience led him to conclude her statements were threats. Further, Carlson's claim that he was improperly allowed to testify regarding Heckt's change of mind is without merit since she opened the door during trial to testimony about Heckt's initial statement. Thus, the court did not improperly admit LeBlanc's testimony. Further, Carlson has not shown the admission of LeBlanc's testimony prejudiced her since her prima facie case did not turn on the jury finding that she did or did not make a threat.

### iii. Stale and Irrelevant Evidence

Carlson asserts that the court improperly admitted stale and irrelevant evidence in the form of past work performance reviews and journal entries. Specifically, she challenges the admissibility of evidence Boeing offered to show that she was not always a model employee and was at times disruptive. She also challenges journal entries that support Boeing's theory that her conduct was related to her anger at Heckt.

Carlson's work performance was not the core issue here. But her theory of the case included an assertion that she was a model employee. As a defense to this assertion, Boeing could offer evidence that rebutted this claim. And her anger at Heckt is relevant to whether or not she responded in the meeting because the particular situation triggered a PTSD response or if she responded because she generally felt animus toward him.

Also, admission of this evidence did not prejudice her. As noted above, she did not establish notice. The exclusion of this evidence would not remedy this failure.

### C. Cumulative Evidence of Other's Conduct

Carlson claims the court erred by excluding certain disciplinary reports for other Boeing employees accused of making threats of violence in the workplace because they were cumulative.

ER 403 provides a court with discretion to exclude evidence because it is cumulative. Here, Carlson attempted to introduce a number of reports only peripherally related to her case. While the court excluded the substance of the reports, Carlson was allowed to question Boeing about a subset of the reports and elicit responses during trial. Thus, the jury was made aware of the existence of other situations where the employee was not fired for a reported threat but not burdened by cumulative evidence.

Even if the trial court had admitted all of the reports, they would not have cured Carlson's proof problem. To show disparate treatment, Carlson needed to show that Boeing had notice of her disability and fired her because of it. As indicated above, she failed to do this. So the exclusion of these reports did not impact her case.

### D. Impeachment Through Religious Affiliation

Carlson asserts that the court improperly allowed Boeing to impeach her by referring to her religious affiliation. ER 610 forbids impeachment on the basis of religious belief.

During cross-examination, respondent's attorney asked, over objections, whether Carlson was allowed to swear since she was Mormon. Counsel referenced to an entry in Carlson's journal that indicated she "was furious, swearing furious" about the interaction with Heckt. Counsel for the respondent

-27-

asked Carlson if it was "more serious to swear if you [were] a devout Mormon" than not. Carlson said that Mormons were like other people and could "say what [they] want in [their] personal journals."

This line of questioning was improper. But, as indicated above, Carlson did not establish a prima facie case for discrimination. Because these questions did not affect her failure to establish the basic elements of her WLAD claims, Carlson has not shown that this particular exchange prejudiced her.

### New Judge on Remand

Since Carlson fails to establish her claim that the trial court erred or abused its discretion, we do not consider her request for a new judge on remand.

### CONCLUSION

We affirm. Carlson's appeal of the denial of her motion for summary judgment is not reviewable. She fails to establish as a matter of law that Boeing discriminated on the basis of her disability and thus does not show the trial court abused its discretion in denying her motion for judgment notwithstanding the verdict. She also fails to establish that she was prejudiced by the trial court's decisions about jury instructions and the admission of evidence. As a result, she

does not establish that the trial court abused its discretion by denying her request for a new trial.

WE CONCUR:

Leach, J.

Andrus, J.